**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**STEVEN G. WOYNAR and ANNA SAPIA,**

    **Plaintiffs,**

**vs.**                                                **Case No. 6:10-cv-1458-28GJK**

**MICHAEL CHITWOOD, Chief of Police of the City of Daytona Beach, Florida, OFFICER THOMAS ALFANO, OFFICER JAMES CHIRCO, OFFICER ROBERT ATKINS, OFFICER MICHAEL OTERI, OFFICER RANDALL DOYLE, and OFFICER CHARLES FIELDS,**

    **Defendants.**
_____/

## ORDER

Plaintiffs Steven Woynar ("Woynar") and Anna Sapia ("Sapia") bring the instant action pursuant to 42 U.S.C. § 1983 against the Chief of Police of the City of Daytona Beach and six Daytona Beach police officers, asserting violations of several of their constitutional rights. Plaintiffs also assert several state law claims.

The case is currently before the Court on the Motion to Dismiss the Complaint and Motion to Strike Claims for Punitive Damages (Doc. 17) filed by Defendant Michael Chitwood ("Chitwood"); the Motion to Dismiss or in the Alternative Motion to Strike (Doc. 18) filed by Defendants Thomas Alfano ("Alfano"), Robert Atkins ("Atkins"), James Chirco ("Chirco"), Randall Doyle ("Doyle"), and Michael Oteri ("Oteri"); and the Motion to Dismiss or in the Alternative Motion to Strike (Doc. 28) filed by Defendant Charles Fields ("Fields"), in which

Fields adopts the motion filed by Alfano, Atkins, Chirco, Doyle and Oteri. Plaintiffs have responded to the motions. (Docs. 23 & 24). Having considered the parties' filings, the Court finds that the motions must be granted but that Plaintiffs will be permitted to file an amended complaint.

## I. Background[1]

This case arises from the repossession of a boat—a 53-foot trawler called the *Pegasus*. According to the Complaint, Woynar purchased the *Pegasus* in 2004 from non-party Vernon Smith ("Smith") and executed a preferred ship's mortgage to Smith at the time of sale. (Compl. ¶ 15). After purchasing the *Pegasus*, Woynar lived on the vessel with his fiancée, Sapia.

Sometime around late 2007 or early 2008, a dispute arose regarding payments for the boat; Smith maintained that Woynar was in default on the mortgage, but Woynar maintained that the mortgage was current. (Id. ¶ 18). Believing that the mortgage was in arrears, Smith decided to repossess the *Pegasus*, and he retained non-party Ashley Hull ("Hull") to do so. (Id. ¶ 20).

On January 17, 2008, the *Pegasus* was docked at the Loggerhead Marina in Daytona Beach. (Id. ¶ 19). Hull observed the vessel that day but "decided he did not want to undertake the repossession without armed assistance." (Id. ¶ 21). At around 9:45 p.m., Hull went to the Daytona Beach Police Department to speak with someone about his anticipated repossession of the *Pegasus*. (Id. ¶ 22). Hull allegedly "was told that when he was ready

---

[1]The Background facts are taken from the Complaint and are assumed to be true for the purpose of deciding these motions under Federal Rule of Civil Procedure 12(b)(6).

-2-

to proceed he was to contact the Police Department and officers would be dispatched." (Id.).

When Hull was ready to proceed with the repossession at around 11:15 p.m. that evening, he contacted the dispatcher for the Daytona Beach Police Department, explained that he had been told to call when he was ready, and told the dispatcher that Woynar "was going to 'get very violent'" during the attempted repossession. (Id. ¶ 23). Defendant Alfano allegedly "was dispatched to assist Hull," (id.), and Alfano allegedly "understood his job was to assist the repossessor" of the boat, (id. ¶ 24).

Alfano, in his police uniform, arrived at the marina and saw that Hull had papers in his hand but did not inspect them. (Id. ¶ 25). At approximately 11:29 p.m., Hull and Alfano approached the *Pegasus* together and called to Woynar, who was on an upper deck of the vessel. (Id. ¶ 26). Woynar came down to the dock level, and Hull accused him of stealing the boat and informed him that it was being repossessed on Smith's behalf. (Id.). Woynar objected, stating that he was the registered owner of the vessel and had papers on board to prove that he had paid the mortgage. (Id.). Nevertheless, Alfano allegedly "ordered Woynar to do what Hull said and he escorted Woynar off the vessel." (Id.).

Alfano then contacted Defendant Doyle, a sergeant at the police department, who ordered a K-9 search of the vessel. Three other officers—Defendants Atkins, Chirco, and Oteri—then arrived with three dogs. Chirco allegedly had been advised of a "suspicion" that there were narcotics, and possibly a meth lab, on the vessel, and the source of that "suspicion" was Hull. (Id. ¶ 27). Chirco and his dog, Yarko, conducted a search of the *Pegasus*, and Yarko allegedly alerted on two spots. (Id. ¶ 28). Chirco then ordered that

Woynar be detained, and Alfano handcuffed Woynar and forced him to sit on the ground. (Id.). After Chirco was aboard the vessel for about five minutes, Doyle ordered Chirco to stop the search.[2] (Id.).

Thereafter, "Doyle ordered Woynar released from custody but 'trespassed' from the vessel and marina." (Id. ¶ 32). Woynar, accompanied by Defendant Fields, who had by then arrived on the scene, was permitted to board the vessel and retrieve some of his belongings. (Id.). However, when Woynar attempted to move some bags of items off the vessel, Defendant Oteri "made Woynar put the bags back" because Oteri did not have time to determine whether the items were subject to the mortgage. (Id.). A third party allegedly described what happened next as Woynar being "'shooed away' from the vessel like a stray dog." (Id.).

Sapia was not onboard the *Pegasus* when Hull and Alfano arrived but was at the marina's laundry facility. (Id. ¶ 29). When she returned to the vessel, shoeless and dressed for bed in boxer shorts and a T-shirt, Woynar was in handcuffs and police officers were on the vessel. (Id.). Sapia objected to the repossession but "was issued a 'trespass notice'" by Fields and was "threatened with arrest if she did not leave the marina immediately." (Id. ¶¶ 29, 31). Sapia was not permitted to retrieve personal items from the *Pegasus*. (Id. ¶ 29). Thereafter, Sapia left the marina and walked approximately four miles to Halifax Hospital, arriving in a hysterical state. (Id. ¶ 30).

---

[2]After Yarko alerted, Oteri and Atkins boarded the vessel and "purportedly found 'suspected' seeds and a pipe with 'suspected' marijuana residue." (Compl. ¶ 28). However, neither of these items was ever tested, and both of them were destroyed by the police. (Id.).

Two hours later, the vessel "was 'cleared' by the police and 'released' to Hull," who moved it to another location and had exclusive possession of it until January 26, 2008. (Id. ¶ 33). On that date, the *Pegasus* was taken from Hull by the U.S. Marshal pursuant to an order entered in a federal court case filed by Woynar. (Id.). During the time that the *Pegasus* was in Hull's possession, cash and other items were removed and the vessel was extensively damaged. (Id.).

Plaintiffs filed this lawsuit on September 30, 2010. In the Complaint, Woynar alleges six counts and Sapia alleges eight counts. These counts are: Count I—Deprivation of Property Without Due Process (Woynar); Count II—Unconstitutional Seizure (Woynar); Count III—Unconstitutional Search (Woynar); Count IV—Assault (Woynar); Count V—Intentional Infliction of Emotional Distress (Woynar); Count VI—Negligence (Woynar); Count VII—Unconstitutional Search (Sapia); Count VIII—Unconstitutional Seizure (Sapia); Count IX—Deprivation of Property Without Due Process (Sapia); Count X—Deprivation of Liberty Without Due Process (Sapia); Count XI—Cruel and Unusual Punishment (Sapia); Count XII—Assault (Sapia); Count "XIV"[3]—Intentional Infliction of Emotional Distress (Sapia); and Count XV—Negligence (Sapia). Defendants seek dismissal of all of these claims.

## II. Legal Standards

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.'" Fed. R. Civ. P. 8(a)(2). "'[D]etailed factual allegations'" are not required, but "[a] pleading that offers 'labels and conclusions' or

---

[3]There is no count labeled "Count XIII" in the Complaint; instead, the Complaint skips from Count XII to Count XIV.

'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). In considering a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." LaGrasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

### III.  Discussion

In their motions to dismiss, the Defendants raise several points, including that the Complaint pleads each count as to all Defendants together, regardless of the role described as to that Defendant in the more general description of the facts. The Court agrees that the failure of the Complaint to specify which counts are against which Defendant(s) is problematic[4] and does not satisfy the requirement of Federal Rule of Civil Procedure 8 that a complaint include "a short and plain statement of the claim," the purpose of which is to provide the court as well as the Defendants with fair notice of the claims.[5] See, e.g., Gregory v. TCF Bank, No. 09 C 5243, 2009 WL 4823907, at *2 (N.D. Ill. Dec. 10, 2009) (noting that

---

[4]Indeed, Plaintiffs acknowledge in their response papers that, for example, some of the counts do not apply to the Chief of Police. (See Doc. 23 at 12).

[5]For example, in Count VII Plaintiffs refer to four of the Defendants by name, (Compl. ¶ 67), but in the next paragraph Plaintiffs refer to "the Defendant officers," (id. ¶ 68). It is unclear to the Court—and surely to the Defendants as well—which of them are being sued in this count. Such lack of clarity is a theme throughout the Complaint.

"throughout the complaint, Defendants are 'lumped' together, and it is difficult to ascertain which actions Plaintiffs are ascribing to each of the defendants").  Although there is no "heightened pleading requirement" applicable to § 1983 claims even where a qualified immunity defense might be raised,[6] more is required to put each Defendant on notice of the claim against him than the generalized assertions made in the Complaint.

The Complaint also fails to specify in which capacity each Defendant is being sued with regard to the § 1983 claims.[7]  It appears to the Court that all Defendants are being sued in their individual capacities, but Plaintiffs' response papers refer in part to "municipal liability," which suggests that at least Defendant Chitwood is being sued in his official capacity rather than his individual capacity.  See, e.g., Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' . . . As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (quoting Monell v. New

---

[6]See Randall v. Scott, 610 F.3d 701, 710 (11th Cir. 2010) ("After Iqbal it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints.").

[7]The capacity in which a party is sued is distinct from the matter of whether the party acted "officially" or "under color of law."  A defendant can act under color of law and still potentially be sued in either his individual capacity or his official capacity.  A claim against an officer in his individual capacity means that the plaintiff seeks to recover damages from the officer personally, while a claim against the officer in his "official capacity" is the equivalent of a suit against the entity for whom he works.  See Kentucky v. Graham, 473 U.S. 159, 165 (1985).  Thus, for example, contrary to Defendants' assertion in their motion papers, (see Doc. 18 at 2), the allegation in paragraph 26 of the Complaint that Officer Alfano was "acting in his official capacity" does not mean that Plaintiff may not bring an individual-capacity suit against Officer Alfano.

York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978))).  Officer Chitwood could be sued in his individual capacity for an improper policy, or the municipality could be sued on this basis[8]; the Complaint is not clear as to whom Plaintiffs seek to hold liable.

With regard to the state law claims, whether a particular count is properly brought against the officer or the municipality for which he works depends on whether the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  § 768.28(9)(a), Fla. Stat.  Thus, "[i]n any given situation either the [municipality or the officer] can be held liable under Florida law, . . . but not both."  McGhee v. Volusia Cnty., 679 So. 2d 729, 733 (Fla. 1996).  Furthermore, claims of simple negligence are viable only against the municipality.  See, e.g., Wilson v. Duval Cnty. Sch. Bd., 436 So. 2d 261, 263-64 (Fla. 1st DCA 1983).

In sum, although it appears that Plaintiffs may well have some viable claims against at least some of the Defendants—including a Fourth Amendment unreasonable seizure claim based on police involvement in a private repossession[9]—it also appears that one or more of the Defendants may have strong legal arguments against the sufficiency of some

---

[8]Although extensive analysis of the sufficiency of Plaintiffs' "policy or custom" allegations will not be undertaken here, it is noted that the Complaint merely alleges that the conduct of the individual officers "showed an absence of adequate training," (Comp. ¶ 40), which is not enough to describe an actionable unconstitutional policy.  Plaintiffs allege more than this in their response papers, (see, e.g., Doc. 23 at 4), but they do not allege more in the Complaint.

[9]See, e.g., Wright v. Sheppard, 919 F.2d 665, 673 (11th Cir. 1990) ("If an officer departs from the role of neutral law enforcement officer by attempting to enforce a private debt collection, and engages in conduct that effectively intimidates an alleged debtor into refraining from exercising her legal rights, then the officer exceeds constitutional limits on his authority.").

of the counts. These matters are more appropriately considered after the deficiencies noted above have been rectified. Plaintiffs may replead their claims so that the discrete issues involved can be properly assessed with regard to each Defendant.

### IV.  Conclusion

In accordance with the foregoing, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motions to Dismiss (Docs. 17, 18, & 28) are **GRANTED without prejudice**. The Complaint (Doc. 1) is **DISMISSED without prejudice**.

2. Plaintiffs may file an amended complaint **on or before Friday, June 24, 2011.**

**DONE** and **ORDERED** in Orlando, Florida this 8th day of June, 2011.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record