# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**STEVEN G. WOYNAR and ANNA SAPIA,**

        **Plaintiffs,**

**-vs-**                              **Case No.  6:10-cv-1458-Orl-28GJK**

**CITY OF DAYTONA BEACH, OFFICER THOMAS ALFANO, OFFICER RANDALL DOYLE, and OFFICER CHARLES FIELDS,**

        **Defendants.**

_____

# ORDER

In this suit brought pursuant to 42 U.S.C. § 1983, Steven Woynar and Anna Sapia (collectively "Plaintiffs") allege violations of their constitutional rights by the City of Daytona Beach ("the City") and several of its police officers.  The case arises from the repossession of a boat on which the Plaintiffs were living; the private repossession was allegedly conducted with the assistance and participation of several police officers.

This matter is currently before the Court on the summary judgment motions filed by the Defendants.[1]  Having considered the parties' submissions, the record evidence, and

_____

[1]The pertinent filings are:  (1) the Motion for Summary Judgment filed by Defendant Charles Fields (Doc. 67); Plaintiff Sapia's Memorandum in Opposition thereto (Doc. 81); and Defendant Fields's Reply (Doc. 88); (2) the Motion for Summary Judgment filed by Defendant Randall Doyle (Doc. 68); Plaintiff Woynar's Memorandum in Opposition thereto (Doc. 78); and Defendant Doyle's Reply (Doc. 87); (3) the Motion for Summary Judgment filed by Defendant Thomas Alfano (Doc. 69); Plaintiff Woynar's Memorandum in Opposition thereto (Doc. 79); and Defendant Alfano's Reply (Doc. 86); and (4) the Motion for Summary Judgment filed by the City (Doc. 72); Plaintiffs' Memorandum in Opposition thereto (Doc. 89);

pertinent law, the Court concludes that the individual officers' motions must be denied and the City's motion must be granted.

## I.  Background

In 2004, Woynar purchased the *Pegasus*, a fifty-three foot trawler, from non-parties Vernon Jack Smith ("Mr. Smith") and Marion E. Smith.  After the transaction, Woynar took possession of the vessel and the Smiths held a Preferred Ship Mortgage in the amount of the balance of the purchase price.  (Preferred Ship Mortgage, Doc. 67-1).

In January 2008, Plaintiffs, who were engaged to be married, were living aboard the *Pegasus*, which was docked at a marina in Daytona Beach, Florida.  During that month, Mr. Smith, deeming the mortgage in default, enlisted Ashley Hull, who had some repossession experience, to repossess the *Pegasus*.[2]  (See Hull 2008 Dep.[3] at 46).  On January 17, 2008, Hull went to the Daytona Beach Police Department ("DBPD") to advise of his intention to repossess the vessel later that day.  (Id. at 97-98).  Hull was told to contact the police again

_____

and the City's Reply (Doc. 95).

[2]The Preferred Ship Mortgage included a provision stating that if an event of default occurred, the Smiths "may . . . [r]etake the vessel without legal process at any time wherever the same may be."  (Preferred Ship Mortgage at 3).

[3]The consecutively paginated, two-volume deposition of Hull that was taken in March and April 2008 (Docs. 80-1 & 80-2) shall be referred to as "Hull 2008 Dep."  Hull was again deposed in September 2011.  (Doc. 67-5).
Defendants have objected to Plaintiffs' submission of, and the Court's consideration of, Hull's 2008 deposition—which was taken in a prior case—as well as other depositions taken in that case.  However, the Court has already addressed and rejected Defendants' arguments in a prior Order (Doc. 98).  As noted in that Order, such deposition testimony is "'at least as good as an affidavit and should be usable whenever an affidavit would be permissible.'"  (Id. at 3 (quoting 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2142, at 634-35 (3d ed. 2010))).

thirty minutes before going aboard and they would "send out an officer." (Id. at 97-99).

Hull observed the vessel for about eight hours throughout the afternoon of January 17 to determine if it was in working order and to ascertain how many people were onboard; he saw three people coming and going, one of whom appeared to be a maintenance person and one of whom was Woynar. (Id. at 190-91).  After arranging for a captain to assist him with piloting the boat after the anticipated repossession, (id. at 197), at around eleven o'clock that evening Hull called the DBPD dispatch line, which is operated by the Volusia County Sheriff's Office, (id. at 104).  Hull was told "to stand by until an officer gets there," and Hull did so. (Id.).  DBPD Officer Thomas Alfano ("Officer Alfano") was dispatched to the marina and made contact with Hull.

Accounts of what then occurred vary from witness to witness, but it is undisputed that Hull approached Woynar and informed him of his intention to repossess the *Pegasus*; that Officer Alfano called his supervisor, Sergeant Randall Doyle ("Sergeant Doyle"), and requested that a K-9 unit be sent to search the vessel; that Sergeant Doyle called a K-9 unit, and three more police officers and one dog arrived and conducted a drug sniff of the vessel; that at some point during these events Woynar was handcuffed by Officer Alfano but later released; that Sergeant Doyle arrived on the scene, as did another officer, Charles Fields ("Officer Fields"); and that Sapia, who had been doing laundry at the marina's laundry facility at the time the repossession began, was issued a trespass warning by Officer Fields and ordered to leave the marina.  Ultimately, Hull and his hired captain took the boat from the marina at around sunrise the next morning.

Woynar has submitted an affidavit in which he states that on the evening of the events

at issue, he was aboard the *Pegasus* assisting an electronics technician who was doing some work on the vessel when he heard his name called by someone on the dock. (Woynar Aff., Doc. 81-1, ¶ 2). He then stepped off the vessel and was immediately confronted by Hull and a police officer, both of whom had guns in holsters. (Id.). Hull asked him if he was Woynar, and when Woynar responded affirmatively Hull accused him of stealing the vessel and told him that he and the officer were there to take back the *Pegasus* for Mr. Smith. (Id. ¶ 3). Woynar responded that he had not stolen the vessel but instead owned it and had documentation on board establishing his ownership. (Id.). Hull told him to get his things off the boat because Hull was going to take it. (Id.).

Woynar then told the officer that he owned the boat and had the papers to prove it; when Woynar turned to go back aboard to get the papers, he "was restrained from the back by both Hull and the Officer." (Id. ¶ 4). Woynar states that he "was placed in handcuffs and Hull with the police went aboard the vessel with dogs." (Id. ¶ 5). Woynar further states that he "was ordered by the police to get [his] things and get off the vessel and [was told that he] would be arrested and taken to jail if [he] did not." (Id. ¶ 7). As Woynar gathered his things, Hull objected to the number of items Woynar was taking; the police then said that Woynar "was taking too much and they did not have time to go through [his] things piece by piece so [Woynar] was not allowed to take anything"; he was then told to "get lost." (Id. ¶ 7).[4] Woynar attests that he told Hull he could not take the boat, but Woynar was told to "quit

---

[4](Accord Woynar Dep., Doc. 67-4, at 76 (testimony that Woynar was told to leave or he would be trespassed and "was sent on [his] way" despite his protests that the *Pegasus* was his home)).

objecting" and that "[i]t was over with."   (Id. ¶ 8).   Woynar "protested the seizure until it became obvious the police were assisting Hull," and he "never consented to the taking of [the] vessel."  (Id. ¶ 9).

Sapia has also submitted an affidavit.  (Doc. 81-2).  She states that she was in the marina's laundry facility when Mr. Smith walked in[5] and told her that the police had raided the *Pegasus* and that Woynar was being arrested.  (Id. ¶ 2).  Sapia ran outside and saw Woynar sitting on the dock in handcuffs next to the vessel.  (Id.).  As Sapia approached to see what was going on, Hull stopped her and told her she could not go aboard the vessel, grabbing her by her arms and telling her not to move.  (Id.).  When Sapia asked Hull what authority he had to take the vessel, he "showed [her] his gun and said that was all the authority he needed."  (Id. ¶ 3).  Hull told a police officer to "get rid of" her, and she was then issued a trespass warning and told that if she did not leave immediately she would be arrested.  (Id. ¶ 4).[6]  Sapia was not allowed to get anything off the vessel—not better clothes than what she was wearing, not shoes, and not her medications—and, not knowing where to turn, she walked—barefoot, hysterical, and in "night attire"—to a hospital.  (Id. ¶ 5).

Woynar and Sapia filed this lawsuit in September 2010.  In the Amended Complaint (Doc. 40), Plaintiffs allege that the police involvement in the repossession of the *Pegasus*

---

[5]According to other testimony, Mr. Smith had been summoned to the marina by Hull at the request of one of the officers and had arrived within fifteen minutes of being contacted. (Hull 2008 Dep. at 115-16).

[6](Accord Hull 2008 Dep. at 245 ("All she did was scream and yell at me.  I . . . told Officer Fields to just . . . get rid of her."); Fields Dep., Doc. 80-6, at 16-17, 24-25 (stating that he wrote a trespass warning against Sapia on the instructions of Hull, who told him that Sapia was creating a verbal disturbance and was refusing to leave)).

rendered the repossession an unconstitutional seizure and a deprivation of property without due process.  They also assert that the search of the vessel was an invalid warrantless search under the Fourth Amendment, that Woynar's person was unreasonably seized, and that the issuance of a trespass warning to Sapia violated her constitutional rights.  Woynar brings five claims and Sapia brings three.  Named as Defendants are the City, Sergeant Doyle, and Officers Alfano and Fields.[7]  Each of the four Defendants has filed a motion for summary judgment, all of which are ripe for ruling.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

---

[7]Plaintiffs initially also named the three K-9 officers and the Chief of Police as Defendants. (See Docs. 1 & 40). However, Plaintiffs had sued those Defendants only in their "official capacities," and in response to a show cause order from this Court Plaintiffs agreed that the City of Daytona Beach should be substituted in the place of the "official capacity" Defendants.  (Docs. 60 & 63).  That substitution was made, (Order, Doc. 65), and the only remaining Defendants are those noted.

that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1263 (quoting Anderson, 477 U.S. at 251-52).

## III.  Discussion

### A.  The Release

The City, Officer Alfano, and Sergeant Doyle argue in their summary judgment motions that "[t]here is good reason to believe that the General Release executed by Mr. Woynar in connection with [another case] may bar the claims" against them in this case. (Doc. 69 at 1; see also Doc. 68 at 1 & Doc. 72 at 1-2).  These Defendants note that in a prior admiralty case filed in this court regarding the *Pegasus*[8]—Case No. 6:08-cv-117-Orl-DAB[9]—Woynar executed a general release as part of a settlement.  Defendants also note

---

[8]Woynar filed the admiralty case to establish title and right to possession of the *Pegasus*.

[9]In their motions, Officer Alfano and Sergeant Doyle have provided the case number

that they had filed a motion to compel production of that release, which was still pending when they filed their summary judgment motions.  These Defendants argue that they believe the release bars claims of Woynar against not only the Smiths and Hull but also their "agents, employees, representatives, and affiliates," which allegedly includes the police officers who allegedly acted under Hull's direction.

Since the filing of the summary judgment motions, the motion to compel production of the release (Doc. 58) has been denied.  (See Docs. 71, 73, & 94).  No release has been presented to the Court by the Defendants.  Consequently, the Defendants have not established entitlement to summary judgment based on a release.

B.  Failure to State a Claim

In their summary judgment motions (Docs. 67 & 68), Officer Fields and Sergeant Doyle argue that the Amended Complaint fails to state cognizable § 1983 claims against them.   However, neither of these Defendants filed a motion to dismiss the Amended Complaint; instead, each filed an Answer (Docs. 46 & 47).  Thus, they are now asserting arguments not raised in a motion to dismiss and allege deficiencies that likely could have been cured by amendment.  For example, Sergeant Doyle argues in his motion that the Amended Complaint fails to allege that he acted under color of law.  (See Doc. 68 at 10).

Summary judgment will not be granted to Officer Fields or Sergeant Doyle based on pleading deficiencies.  These Defendants did not challenge the sufficiency of the pleading

---

of the instant case as the case number of the admiralty case—apparently a clerical error. (See Doc. 69 at 1, 11; Doc. 68 at 9).  The City, however, has provided the correct admiralty case number in its motion.  (See Doc. 72 at 2).

of the Amended Complaint when it was filed, and they have since had an opportunity to determine the basis for Plaintiffs' claims through discovery.  On summary judgment the pertinent issue is not the sufficiency of pleading but whether there is a genuine issue of material fact for trial.

C.  Qualified Immunity of the Individual Defendants

The main argument raised by Officer Alfano, Sergeant Doyle, and Officer Fields is that they are entitled to summary judgment based on the defense of qualified immunity. "Qualified immunity protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"To receive qualified immunity, the officer must first show that he acted within his discretionary authority."  Id.  In the instant case, the officers were acting within their discretionary authority at the time of the events at issue.  See generally O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004) (explaining that government officials act within their discretionary authority when they are performing a job-related function through means that are within their power to utilize).[10]  Thus, "the burden . . . shifts to the plaintiff[s] to show that

---

[10]Woynar apparently does not challenge that Sergeant Doyle and Officer Alfano were acting within their discretionary authority.  (See Docs. 78 & 79).  Sapia, however, argues in her memorandum in opposition to Officer Fields's motion that Officer Fields was not so acting at the time he issued a trespass warning to her.  (See Doc. 81 at 14-15).  She asserts that Officer Fields "has no discretion to take state action on behalf of one citizen against another when there is no state interest being served."  (Id. at 15).  However, the relevant question in the discretionary authority analysis is as noted in the text—whether a state actor is performing a job-related function through means within his power to utilize.  For example,

qualified immunity should not apply." Lewis, 561 F.3d at 1291.

To determine whether a government official enjoys the benefit of qualified immunity at the summary judgment stage, courts must assess whether the facts, viewed in the light most favorable to the plaintiffs, show a violation of a constitutional right and whether that right was clearly established at the time of the conduct at issue. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). This two-part analysis need not be undertaken in any particular order. Id. at 236.

Law can be clearly established by "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida)." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (internal citations omitted).

The Supreme Court has emphasized that there need not be a previous case with

_____

the threshold discretionary authority inquiry in the Fourth Amendment context is not "'whether [an officer] has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities.'" O'Rourke, 378 F.3d at 1206 (quoting Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004)). Issuance of trespass warnings is part of Officer Fields's job-related powers, and thus Officer Fields was acting within the scope of his discretionary authority when he issued a trespass warning to Sapia. Sapia's argument to the contrary is rejected.

"materially similar" facts in order for a public official to be on notice that his conduct is unlawful.  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  Rejecting such a requirement as a "rigid gloss on the qualified immunity standard," id., the Hope Court explained "that officials can still be on notice that their conduct violates established law even in novel factual circumstances," id. at 741.  The "salient question" is whether at the time of the events at issue the law gave officials "fair warning" that their conduct was unconstitutional.  Id.  Thus, "'general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'"  Id. (alteration in original) (further internal quotation omitted) (quoting United States v. Lanier, 520 U.S. 259, 270-71 (1997)); accord Willingham v. Loughnan, 321 F.3d 1299, 1301-02 (11th Cir. 2003).

Although Defendants argue to the contrary,[11] case law of the United States Supreme Court and the Eleventh Circuit Court of Appeals as of January 2008 had clearly established—viz., provided "fair warning"—that police assistance in a private repossession can constitute an unreasonable Fourth Amendment seizure.  In Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 513 (5th Cir. 1980), the predecessor court to the Eleventh Circuit[12]

_____

[11]Officer Fields, however, does state in his motion that "[a]dmittedly, an officer's participation in a private repossession could amount to a Fourth Amendment seizure." (Doc. 67 at 7).

[12]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the Fifth Circuit handed down prior to October 1, 1981.

agreed with the "contention that police intervention and aid" in repossession of an automobile "would constitute state action" but found that "the testimony failed to show such intervention and aid."

Five years later, in Booker v. City of Atlanta, 776 F.2d 272, 273 (11th Cir. 1985), two trucks were repossessed while a police officer "stood by to keep the peace."  The court noted that if the police officer's "involvement at the repossession was nothing more than mere presence to prevent a breach of the peace, . . . [t]he requisite state action would be lacking." Id.  However, distinguishing Menchaca on its facts, the court affirmed the denial of summary judgment to the officer, noting that the officer "arrived with the repossessor [and e]ven if a jury were to find that [the officer] did not actively assist with the repossession, it nevertheless could find that [the officer's] arrival with the repossessor gave the repossession a cachet of legality and had the effect of intimidating [the plaintiff] into not exercising his right to resist, thus facilitating the repossession."  Id. at 274 (footnote omitted).  "Even if unintended, such an effect could constitute police 'intervention and aid' sufficient to establish state action."  Id. Five years after Booker, in Wright v. Sheppard, 919 F.2d 665 (11th Cir. 1990), the court expressly stated that "[i]f an officer departs from the role of neutral law enforcement officer by attempting to enforce a private debt collection, and engages in conduct that effectively intimidates an alleged debtor into refraining from exercising her legal rights, then the officer exceeds constitutional limits on his authority."  Id. at 673 (citing Booker).

In Soldal v. Cook County, 506 U.S. 56 (1992), a trailer park owner notified the sheriff's department that she was going to remove the plaintiff's trailer home from the park "and requested the presence of sheriff deputies to forestall any possible resistance."  Id. at 58.

-12-

Later that day, two trailer park employees arrived at plaintiff's trailer accompanied by a deputy sheriff.  While the employees disconnected the water and sewer lines and hooked the trailer to a tractor, the deputy sheriff told the plaintiff that "he was there to see that [the plaintiff] didn't interfere."  Id.  After two more deputies arrived, the plaintiff told them he wanted to file a complaint for criminal trespass.  One of the deputies consulted a district attorney and then told the plaintiff that he would not accept a criminal complaint because the matter was between landlord and tenant and "they were going to go ahead and continue to move out the trailer."  Id. at 58-59.  The trailer park employees eventually pulled the trailer free and moved it to a neighboring property.

The plaintiffs brought suit for violation of their Fourth Amendment rights, claiming that the trailer park had conspired with the deputy sheriffs to unreasonably seize the trailer home. The district court granted summary judgment to the defendants on the basis that there was no evidence of conspiracy and therefore no state action.  The Seventh Circuit Court of Appeals affirmed, holding, on rehearing en banc, that although a "seizure" had occurred, "absent interference with privacy or liberty[] a 'pure deprivation of property' is not cognizable under the Fourth Amendment."  Id. at 60.

The Supreme Court reversed, concluding:  "As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term 'mobile home.'  We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment."  Id. at 61.  Accord Tinney v. Shores, 77 F.3d 378, 381 (11th Cir. 1996) (noting, in the course of finding that no substantive due

process claim was stated by plaintiffs whose house-trailer was taken and sold, that the Soldal decision "makes clear that the Fourth Amendment is the textual source of the [plaintiffs'] constitutional protection"). The Soldal Court did not, however, examine the issue of whether the Fourth Amendment was violated—that is, whether the seizure was unreasonable—instead focusing only on the Seventh Circuit's analysis of the Fourth Amendment with regard to interference with liberty or privacy.

In another Eleventh Circuit case, Cofield v. Randolph County Commission, 90 F.3d 468 (11th Cir. 1996), an automobile was repossessed by the selling dealership. Before the repossession, the dealership—concerned that the buyers might forcibly resist—contacted the sheriff's office, and a deputy sheriff then accompanied two dealership employees to the plaintiffs' residence. The plaintiffs sued the deputy sheriff for violating their constitutional rights, alleging that there had been an unreasonable seizure in violation of the Fourth Amendment and a deprivation of property without due process in violation of the Fourteenth Amendment. The district court granted summary judgment for the deputy sheriff based on qualified immunity, and the Eleventh Circuit affirmed.

In its opinion, the Eleventh Circuit explained that "an officer's mere presence during a lawful repossession is of no moment" but acknowledged that its precedent suggested "that state action might be present if an officer were to facilitate a repossession." Id. at 471 (citing Booker and Menchaca). Because the plaintiffs' own testimony established that the automobile was already off or on its way off the premises by the time they got to the door to contest the repossession, however, the court concluded that "[t]he implication is that the repossession had been completed before the [plaintiffs] had any contact with" the deputy

-14-

sheriff. Id. at 471-72.

Applying the Hope standard of "fair warning" and its rejection of a requirement of a case with "materially similar" facts, the cases recounted above suffice to clearly establish the impropriety of police assistance with private debt collections and repossessions in this circuit.[13] Although at least one of the Defendants notes that in Cofield the Eleventh Circuit mentioned in a footnote that some prior cases were concerned not with the question of liability but with issue of whether state action was present for the purpose of establishing subject matter jurisdiction, the court clearly acknowledged that prior cases had at least suggested that improper state action would be present if police facilitate a repossession. Moreover, the Cofield decision itself bears on the issue, and especially considering that Cofield predates the Hope "fair warning" standard—which rejected the Eleventh Circuit's previous requirement of "materially similar" facts—it was clearly established in this circuit as of January 2008 that police assistance with a private repossession can violate the Constitution.

Furthermore, construing the facts in the light most favorable to the Plaintiffs, as the

_____

[13]Other circuits have also found these rights clearly established. See, e.g., Cochran v. Gilliam, 656 F.3d 300, 309-11 (6th Cir. 2011) (rejecting deputy sheriffs' argument that their active involvement in assisting landlord in seizure of plaintiff's property was not clearly established as unconstitutional, citing Soldal and other cases, including Booker); Price-Cornelison v. Brooks, 524 F.3d 1103, 1118 (10th Cir. 2008) (concluding that it was clearly established as of at least 2003 "that an officer's assistance in a private party's seizure of property implicates Fourth Amendment protections"); accord Marcus v. McCollum, 394 F.3d 813, 824 (10th Cir. 2004) (concluding that "[s]tate law limiting self-help to those situations where a breach of the peace is avoided, and federal law recognizing that an unlawful repossession can amount to state action and a deprivation of property actionable under § 1983, are both clearly established").

-15-

Court must in addressing Defendants' summary judgment motions, a reasonable jury could find a violation of Plaintiffs' rights by the individual Defendants. The evidence regarding the actions of each of these Defendants will be addressed separately.

1.  Officer Alfano

The summary judgment record is replete with evidence that could support a conclusion that Officer Alfano did more than be "merely present" at the repossession. Woynar's affidavit has been recounted earlier, and Officer Alfano himself has testified in a deposition that he and Hull walked toward the boat together, (Alfano Dep., Doc. 80-8, at 11), and that Woynar "voiced his objections" to the repossession, (id.). Hull's testimony and that of other officers also suggests more than "mere presence" of Officer Alfano. (See, e.g., Hull 2008 Dep. at 106 (stating that as Hull approached the boat and informed Woynar that he was repossessing it, Officer Alfano, who was armed, was standing behind him); id. at 269 (testimony that Officer Alfano went aboard the vessel ahead of Hull in case "there was somebody hiding aboard"; id. at 109 (testimony that Officer Alfano decided to call for the K-9 unit, a decision with which Hull agreed); James Chirco Dep., Doc. 80-7, at 20 (describing that upon Officer Chirco's arrival at the scene, he observed a man—apparently Woynar—being "taken off the vessel by Officer Alfano")).

Plaintiffs also allege a Fourth Amendment violation by Officer Alfano based on the K-9 search of the *Pegasus*. Officer Alfano argues that he believed that Hull was in rightful possession of the vessel and that it was not clearly established that it was unlawful for him to search the vessel at Hull's request. (See Doc. 69 at 14-15). This contention, however, is rejected. The evidence regarding how the search came about is somewhat in conflict.

Furthermore, even if Officer Alfano ordered the search at the request of Hull, if Officer Alfano impermissibly assisted Hull in obtaining possession of the boat he could not then reasonably rely on Hull's consent to search.

Accordingly, Officer Alfano is not entitled to summary judgment.

2.  Sergeant Doyle

Plaintiffs assert that Sergeant Doyle violated the Fourth Amendment by authorizing and overseeing the K-9 search of Woynar and of the *Pegasus.*  Plaintiffs aver that the search was warrantless and without consent, probable cause, or exigent circumstances to justify it. Plaintiffs also contend that Sergeant Doyle facilitated the repossession of the vessel by, inter alia, directing other officers to assist Hull and allowing Hull to take the vessel.

Sergeant Doyle argues that Plaintiffs attempt to hold him liable as a supervisor without a supportable basis for doing so.  "'[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'"  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).  Such officials are not liable for their subordinates' unconstitutional acts unless "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."  Id.

Sergeant Doyle contends that he did not personally participate in the search and that therefore he cannot be held liable for it.  It is undisputed, however, that Sergeant Doyle did *authorize* the K-9 search after being contacted by Officer Alfano on the telephone, and thus the salient question with regard to the search is whether this authorization could render

Sergeant Doyle accountable.

It is undisputed that Sergeant Doyle's authorization of the search was based on the information provided to him over the telephone by Officer Alfano. According to both Officer Alfano and Sergeant Doyle, Officer Alfano called Sergeant Doyle and told him that there had been a repossession of a boat and that the repossessor was requesting that the police check it for narcotics. (Alfano Dep., Doc. 80-8, at 12; Doyle Dep., Doc. 72-7, at 33). If this were the only evidence germane to the issue and if Sergeant Doyle's only involvement had been over the telephone, Sergeant Doyle's position might have merit, as he may have had no reason to inquire of Officer Alfano regarding the circumstances at the scene of the repossession. See Morfin v. City of E. Chicago, 349 F.3d 989, 1001-02 (7th Cir. 2003) (affirming district court's grant of summary judgment to police chief where the only evidence of record showed that chief relied on information provided over the telephone by another officer regarding what was happening at scene of arrest and there was no reason for chief to inquire further of the officer or prevent him from arresting the plaintiff). However, there is evidence that Sergeant Doyle's involvement was more extensive.

After the telephone conversation between Officer Alfano and Sergeant Doyle and after Sergeant Doyle called the K-9 officers and directed them to respond to the scene, Sergeant Doyle went to the marina[14] while the events in question were still unfolding. Although there is conflicting testimony as to who arrived when, there is record evidence that Sergeant Doyle

---

[14]Sergeant Doyle explained in his deposition that he went to the marina because it is his duty if time permits to follow up and because he had three K-9 officers at the marina and wanted to make sure everything was okay. (Doyle Dep. at 45-46).

was present when the K-9 officers arrived—and before they started searching—and that Woynar was there at the time.  (See Alfano Dep. at 12, 30; Chirco Dep. at 9; Oteri Dep., Doc. 72-5, at 20-23; Atkins Dep., Doc. 72-6, at 13, 24-25).  In light of the testimony regarding Sergeant Doyle's presence at the scene and the conflicting evidence regarding the circumstances he encountered there, it cannot be determined on summary judgment that Sergeant Doyle did not personally participate in an unconstitutional search.

Additionally, as noted by Plaintiffs, the claim against Sergeant Doyle goes beyond Sergeant Doyle's authorization of and involvement in the K-9 search.  Plaintiffs also assert participation by Sergeant Doyle in the repossession of the *Pegasus* more generally.[15]  There is evidence to support this assertion, including the deposition testimony of Officer Fields, who stated that when he arrived—after being summoned to the marina by Sergeant Doyle—Sergeant Doyle was there and the boat was "in the process of" being repossessed. (Fields Dep., Doc. 80-6, at 6-7, 11).  As explained by Officer Fields, he was instructed to stand by with Woynar, who was not being allowed to get back on the boat to retrieve his belongings because of the in-progress repossession.  (Id. at 10-11).  According to Officer

---

[15]Sergeant Doyle argues that the claim against him is limited to paragraphs 57 and 58 of the Amended Complaint.  However, the Amended Complaint contains other allegations regarding Sergeant Doyle's involvement in the incident.  Plaintiffs pleaded both a municipal liability claim and, in the alternative, a claim against Sergeant Doyle in his individual capacity. Even though not all of the allegations were repeated in Count V, the Court cannot find that Sergeant Doyle has not been on notice of the nature of the claim against him.  The capacity in which the Defendants were being sued was not sorted out until after the close of discovery, (see Docs. 60, 63, & 65), and the Court has considered all of the allegations in the Complaint in addressing the claims against Sergeant Doyle and the other Defendants on summary judgment.  As stated later in this Order, the scope of the claims remaining for trial against the individual Defendants will be discussed at the final pretrial conference.

Fields, at that point Woynar was not happy with the situation and was saying that the boat was his. (Id. at 12).  When Woynar was eventually allowed—albeit temporarily—back on the boat to retrieve some personal items, Officer Fields was instructed by Sergeant Doyle to stand by with Woynar.  (Id. at 6-7, 10).  In Officer Fields's words, Sergeant Doyle told Officer Fields to "standby while this repo transpired."  (Id. at 30).  This evidence is sufficient to preclude granting summary judgment to Sergeant Doyle with regard to his participation in the repossession as well.

> 3.  Officer Fields

In Count IX, Sapia brings a claim against Officer Fields in his individual capacity based on his actions on the night of the repossession, including trespassing Sapia from the marina.  Like Officer Alfano and Sergeant Doyle, Officer Fields asserts that he is entitled to summary judgment based on qualified immunity.  However, Officer Fields's motion for summary judgment must also be denied.

Officer Fields testified in his deposition that he was called to the marina by Sergeant Doyle to stand by while Woynar was removing his personal property from the vessel.  (Fields Dep. at 6).  According to Officer Fields, when he arrived shortly after midnight, Sergeant Doyle, Officer Alfano, and at least one K-9 officer were there, and the boat "was in the process of" being repossessed; for that reason, Woynar was not being allowed back on the boat.  (Id. at 7, 11).  Officer Fields was directed to Woynar and was told to stand by with him until they got finished "assessing that this was the proper boat they needed."  (Id. at 10).  Once the boat was cleared, they allowed Woynar to enter the boat to retrieve his belongings, and Officer Fields accompanied Woynar onto the boat while he gathered his personal items.

(Id. at 7, 10, 15).  Officer Fields was told to make sure Woynar did not take any property that was not his, though Officer Fields had no means of making that determination.  (Id. at 15-16).  It was up to Officer Fields to raise an issue if it appeared that Woynar was starting to remove vessel equipment instead of personal property.  (Id. at 38).  At some point they realized they could not determine what property was Woynar's and what was not, so Woynar was not allowed to take anything.  (Id. at 39).

Officer Fields observed Sapia on the dock area, and Officer Fields wrote a trespass warning against her because Hull wanted her out of the area, though Officer Fields did not know what authority Hull had to have her trespassed.  (Id. at 16-17, 24-26).  Hull told Officer Fields that Hull had advised Sapia to leave the area and that she was creating a verbal disturbance and refused to leave.  (Id. at 25).  Officer Fields told her that if she did not leave or if she returned she could be arrested.  (Id. at 42).

Sapia contends in Count IX that Officer Fields deprived her of her rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.  As correctly noted by Officer Fields, the Court previously dismissed an official-capacity claim against Fields (Count VIII) that was based on the Eighth Amendment because the Eighth Amendment—which provides the right to be free from cruel and unusual punishment—applies only to convicted prisoners.  (See Order, Doc. 60, at 5 (citing Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977))).  Thus, to the extent the claim against Officer Fields is rooted in the Eighth Amendment, it fails and cannot proceed to trial.

However, in other respects the claim against Officer Fields survives summary judgment.  There is evidence that Officer Fields participated in the repossession of the

*Pegasus*, which resulted in Plaintiffs' personal property as well as the vessel itself being seized.  Officer Fields argues that the repossession took place prior to his arrival, (see Doc. 67 at 7), but in his 2008 deposition he testified that the repossession was still in progress when he arrived, (Fields Dep. at 10-11).  Additionally, although Officer Fields argues that Sapia has not alleged a deprivation of liberty or property without due process of law, there is some evidence of such a deprivation.

Officer Fields argues that his issuing of a trespass warning to Sapia did not infringe any of her clearly established rights, but in making this argument he cites the standard of a "factually similar" case that was rejected by the Hope court.  (See Doc. 67 at 12).  Sapia has responded by citing cases that, though not factually on all fours with the instant matter, do lend some support to her asserted liberty and property interests.  For example, she notes that she lived on the *Pegasus* yet was trespassed from it and the marina by Officer Fields at the behest of a private repossessor.  Cf. Grayden v. Rhodes, 345 F.3d 1225, 1233 (11th Cir. 2003) (condemnation case in which the court characterized a tenant's "interest in enjoying uninterrupted occupancy in [her] residence of choice" as "one of undeniably great magnitude" in the course of discussing the *Mathews v. Eldridge* balancing test for due process claims).  Officer Fields argues that he was not aware that Sapia lived on the boat and "was merely issuing a trespass warning at the request of the property owner." (Doc. 67 at 12).  However, there is evidence–including the testimony of Officer Fields himself—that he trespassed Sapia at the request not of the marina but of Hull.

To be sure, neither Count IX of the Amended Complaint nor Sapia's response

memorandum is a model of clarity.[16]  However, because there is evidence of participation by Officer Fields in the repossession of the *Pegasus* and the seizure of Sapia's personal property, it is clear that Officer Fields is not entitled to qualified immunity *in toto*.  The Court will entertain argument from counsel on the issue of what rights of Sapia are at issue for trial.  As set forth in the next section, the Court will address this and other questions regarding claim scope at the final pretrial conference.

D.  Scope of the Claims Against the Individual Defendants

It is clear from the parties' summary judgment materials as well as from their proposed jury instructions and verdict forms that there is disagreement as to the scope of the claims that are brought against the individual Defendants.  This disagreement is the apparent result of the substitution of the City for the previously-named official-capacity Defendants and the fact that Plaintiffs did not repeat all allegations of their official-capacity claims in their alternatively pleaded individual-capacity claims.  The nature and scope of the claims to be tried against the individual Defendants will be addressed at the final pretrial conference.

E.  Liability of the City

As earlier noted, five counts are brought against the City.  In these claims, Plaintiffs allege that the conduct of the police officers in committing violations of Plaintiffs' constitutional rights was consistent with the policies, practices, and customs of the DBPD regarding participation in private repossessions, thus supporting liability of the City.  Plaintiffs

---

[16]As earlier noted, Officer Fields did not file a motion to dismiss challenging the pleading of Count IX.  See text supra section III.B.

-23-

also assert a failure by the City to adequately train its officers regarding participation in private repossessions.  In its summary judgment motion, however, the City argues that no basis for municipal liability has been established, asserting that the record evidence does not establish a custom of DBPD police officers becoming involved in private repossessions, that its officers were trained as to the appropriate police role in repossessions, and that it was not deliberately indifferent to a need for better training.  The City's position has merit.

"The law is clear that a municipality cannot be held liable for the actions of its employees under § 1983 based on a theory of respondeat superior."  Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (11th Cir. 2001).  In other words, local governments "are not vicariously liable under § 1983 for their employees' actions."  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  Id. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  Id.  Additionally, "[m]unicipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of [the municipality's] inhabitants.'"  Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

Plaintiffs argue that the City can be held liable for the unconstitutional acts of its officers based on a policy or custom as evidenced by a history of prior incidents, and they also argue inadequate training.  However, Plaintiffs' assertion fails in both respects.

First, Plaintiffs contend that there was a pattern in the City of police officers

participating in repossessions, citing deposition testimony of Officer Atkins and Sergeant Doyle that they had been present at repossessions previously. (See Pls.' Resp. Mem., Doc, 89, at 8).  However, as noted by the City, the cited evidence does not establish a history of constitutional violations and does not supply a basis for municipal liability.  The cited testimony pertains to these officers being present at repossessions in the past, but the testimony does not evidence any unconstitutional involvement in or assistance with self-help repossessions.  As noted by the Eleventh Circuit in Booker and Cofield, "mere presence" at a repossession is not sufficient to establish state action or a constitutional violation.  Plaintiffs have failed to come forward with any evidence establishing a history of past violations; indeed, they have not presented evidence of even one prior violation.  Thus, municipal liability cannot be imposed based on a history of prior incidents.

Second, Plaintiffs argue that the City's training with regard to the appropriate role of officers at a self-help repossession was inadequate.  This argument also fails.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Connick, 131 S. Ct. at 1359.  "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  Id. (second alteration in original) (quoting City of Canton, 489 U.S. at 388).  And, "[t]o establish a city's deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'"  Lewis, 561 F.3d at 1293 (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick, 131 S. Ct. at 1360. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id.

The City has presented evidence that its officers do receive some training regarding not getting involved in civil matters—including repossessions—when they attend police academy, during field training, and through legal bulletin updates. Plaintiffs argue that the City's training is not sufficient regarding involvement in self-help repossessions, focusing largely on the testimony of the officers involved regarding the training they recalled receiving and their individual understandings of the law. (See Doc. 89 at 10). However, the Eleventh Circuit has explained that "'the focus must be on the adequacy of the training programs' . . . and not merely on the training deficiencies for a particular officer." Lewis, 561 F.3d at 1293 (quoting City of Canton, 489 U.S. at 390).

Plaintiffs do also challenge the sufficiency of the training as described by DBPD's current division commander overseeing training, but even assuming for the sake of argument that the training was flawed the City cannot be held liable unless it was on notice of a deficiency in its training. As discussed above, Plaintiffs have not presented evidence of a

persistent or widespread practice or even of a single previous constitutional violation relating to police involvement in repossessions.   Thus, Plaintiffs' effort to establish deliberate indifference to a need for better training through "a pattern of similar constitutional violations" likewise falls short.[17]

In sum, Plaintiffs have not established a basis for municipal liability here.  The City's motion for summary judgment therefore will be granted.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  The Motion for Summary Judgment filed by Defendant Charles Fields (Doc. 67) is **DENIED**.

2.  The Motion for Summary Judgment filed by Defendant Randall Doyle (Doc. 68) is **DENIED**.

3.  The Motion for Summary Judgment filed by Defendant Thomas Alfano (Doc. 69) is **DENIED**.

4.  The Motion for Summary Judgment filed by the City of Daytona Beach (Doc. 72) is **GRANTED**.  Although a separate judgment will not be entered for the City at this time, the

---

[17]In Connick, the Supreme Court recounted that in its City of Canton opinion it had "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." Connick, 131 S. Ct. at 1361 (quoting Bryan Cnty., 520 U.S. at 409).  However, Plaintiffs have not argued this theory, and in any event the possibility of "single-incident liability" left open by City of Canton exists only where "the unconstitutional consequences of failure to train [are] patently obvious." Id.  As noted by the Eleventh Circuit, the Supreme Court "has never done more than '*hypothesize*[]'" as to such a situation of patent obviousness. West v. Tillman, 496 F.3d 1321, 1331 n.16 (11th Cir. 2007) (alteration in original) (quoting Gold v. City of Miami, 151 F.3d 1346, 1352 (11th Cir. 1998)).

City has established entitlement to summary judgment in its favor on Counts I, II, III, VI, and VII of the Amended Complaint (Doc. 40) and need not attend the final pretrial conference that has been scheduled by separate notice.

DONE and ORDERED in Orlando, Florida this 3rd day of April, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record